[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 29, 2010
JOHN LEY
CLERK

_____

No. 09-15514

_____

D. C. Docket No. 92-00539-CV-EAK

CARL PUIATTI,

Petitioner-Appellee,

versus

WALTER A. MCNEIL,
Secretary, Florida
Department of Corrections,

Respondent-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 29, 2010)

Before HULL, PRYOR and MARTIN, Circuit Judges.

HULL, Circuit Judge:

Carl Puiatti, a Florida inmate under a death sentence, filed a 28 U.S.C. § 2254 petition for a writ of habeas corpus that challenged his convictions and death sentence. The district court denied the petition as to Puiatti's convictions but vacated Puiatti's death sentence. The district court concluded that the state trial court's denial of Puiatti's motion to sever his penalty phase from his co-defendant's violated Puiatti's constitutional right to an individualized determination of sentence. The State appealed. After review and oral argument, we reverse and remand this case with directions to consider Puiatti's remaining § 2254 claims as to his death sentence.

## I. BACKGROUND

### A. 1983 Crime and Confessions

On August 16, 1983, Puiatti and Robert Glock kidnapped, robbed, and murdered Sharilyn Ritchie. Puiatti (age 20) and Glock (age 22) confronted Ritchie as she got out of her car in the parking lot of a shopping mall in Bradenton, Florida. Glock pulled out a .38 pistol and forced Ritchie into the backseat of her car at gunpoint. Puiatti and Glock got in Ritchie's car, Glock took $50 from Ritchie's purse, and Puiatti drove them to Ritchie's bank, where they made Ritchie cash a $100 check. Then Puiatti drove Ritchie more than 60 miles, to an orange grove outside Dade City, Florida. Puiatti took Ritchie's wedding ring and left her

2

at the roadside.

After driving away for a short distance, Glock said he thought they should kill Ritchie, and Puiatti agreed. Puiatti turned the car around, and when the car pulled abreast of Ritchie, Puiatti shot her twice from inside the car. Puiatti began to drive away, but when Glock saw Ritchie was still standing, Puiatti handed the gun to Glock, turned the car around, and drove by Ritchie again. Glock shot Ritchie. When Ritchie still did not fall, Puiatti made a third pass and Glock shot Ritchie again. Ritchie collapsed and died from her injuries.

Four days later, on August 20, 1983, Puiatti and Glock were in Ritchie's car in New Jersey, with Glock driving. A state trooper stopped them because Ritchie's license plate was improperly displayed. Neither Puiatti nor Glock had a valid driver's license. When Puiatti opened the glove compartment to find the car's registration, the state trooper saw a handgun that was later identified as the gun used to kill Ritchie. The state trooper searched the car and found another handgun. He arrested Puiatti and Glock for possessing handguns without a permit. After Puiatti and Glock were taken to the police station, police officers discovered that the car they were driving was stolen and its owner had been murdered.

The New Jersey State Police assigned Detective John Quinlan to interview Puiatti and Glock. On the evening of August 20, Detective Quinlan questioned

3

Puiatti and Glock for about 15 minutes each, at which time Glock admitted he had stolen the car. On the evening of the next day, August 21, 1983, Detective Quinlan, along with Florida detectives August Stahl and James Wiggins, questioned the defendants again. The detectives questioned Puiatti and Glock separately, for about an hour each. Puiatti, who was interviewed after Glock, initially claimed Glock picked him up in Ritchie's car to give him a ride to New York and that Puiatti knew nothing about the theft of the car or Ritchie's death. After the detectives told Puiatti that Glock already gave a statement about Ritchie's murder, Puiatti said, "I might as well tell you," and gave a statement about the murder.

Puiatti's and Glock's individual confessions, which they gave initially, differed from each other in only two ways: (1) although Puiatti and Glock each confessed to shooting Ritchie, they differed on who fired which shots at her; and (2) they each claimed the other man instigated the killing.

Puiatti and Glock were extradited to Florida. On August 24, 1983, Detective Stahl asked Puiatti and Glock if they would give a joint statement confessing to their involvement in Ritchie's murder, and they agreed. Puiatti and Glock's joint confession resolved the inconsistencies in their individual confessions. Their joint confession stated that Glock had suggested shooting Ritchie, Puiatti fired the two

4

shots on the first pass, and Glock fired the shots on the second and third passes.

## B.    Denial of Motions to Sever

Before trial, Puiatti moved to sever his trial from Glock's, arguing a joint trial was prejudicial. Puiatti alleged that material differences existed between Puiatti's and Glock's individual confessions and that a joint trial interfered substantially with the jury's ability to make an impartial decision as to Puiatti's guilt or innocence and its recommendation of a life or death sentence. Puiatti focused on the defendants' individual confessions and likely antagonistic defenses. Puiatti argued that failure to sever violated the Florida Constitution and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

The state trial court denied Puiatti's motion to sever.[1] The state trial court considered the effect of any differences in the defendants' individual confessions on the penalty phase and concluded any difference was clarified in their joint confession.

## C.    1984 Guilt Phase

Puiatti's and Glock's trial began March 19, 1984. The State called witnesses to testify about, among other things, the discovery of Ritchie's body, the ensuing police investigation, the extent of Ritchie's injuries, the cause of her death, and the

---

[1]The state trial court already had denied Glock's earlier, independent motion to sever.

New Jersey traffic stop that led to Puiatti and Glock's arrests. Detectives from New Jersey and Florida testified that Puiatti and Glock made individual tape-recorded statements to police, confessing their involvement in Ritchie's murder. The State played for the jury the tape-recorded individual confessions of Glock and Puiatti. The state trial court instructed the jury not to consider Glock's individual confession as evidence against Puiatti, and vice versa.

The State's last witness was the court reporter who recorded and transcribed Glock and Puiatti's August 24, 1983 joint confession. The court reporter testified the transcript accurately reflected the defendants' statements and then read the joint confession transcript into the record.

Puiatti's counsel renewed his motion to sever, which the state trial court denied. The joint confession was read in open court.

In the joint confession, Puiatti and Glock acknowledged and waived their Miranda rights.[2] Detective Stahl asked Puiatti to describe the incident:

> Now, what I want you to do is, uh, so each one of us knows what the other is saying, I want you to go through the whole details of the incident from the time it started in Fort Myers and work right back up to the point where you stopped on the New Jersey Turnpike in the State of New Jersey. Okay. When one talks and one leaves out something, the other one can fill in, but don't talk at the same time.

---

[2]Puiatti stated he felt "[a] little bit tired but otherwise okay" and he did not mind giving this statement.

6

Puiatti began, describing how he and Glock kidnapped and robbed Ritchie:

We walked to a Shop and Go Store near Bradenton and called a taxicab to take us to the mall.  We got to the mall about 8:00 o'clock that morning, and, uh, hung around until it opened.  And that day we watched a couple of movies in the mall and we were kind of looking around in the parking lot for a customer to come in to try to get their car.  We had no luck that day.

That night, later that night, we tried to hitchhike out of town and tried for a couple of hours, and it was about 1:00 o'clock in the morning and we had no luck.  So there was a truck parked over by the mall and it was open, so we went in and slept for a few hours until that morning.
. . . .

Okay.  The following morning, which was Tuesday, the 16th, we went and got something to eat.  And we were getting very low on money, so we waited around the mall parking lot until it opened again.  And I'm not sure of the exact time.

Do you remember the time when she came?
. . . .

Mr. Glock:  It was approximately 10:20 – 10:30.

Mr. Puiatti: About 10:30 that morning a woman pulled into the mall parking lot in . . . an orange 1977 Toyota SR-5 Corolla.   That's what it was, Corolla.

At that time when she pulled in she had opened the door and started to get out of the car, and Robert had a handbag with a .38 in it and went up to her, put the gun on her, and she started to scream.  And he told her to get in the backseat.

At that time I got in the car and started – and got behind the driver's wheel and started to pull out of the mall.

At that time Robert went through her purse and found fifty dollars and also found that she had a, uh, bank account.  So she's offering to go to her bank and withdraw some money for us, and we – so we went to the Palmetto Bank on Palmetto Avenue and withdrew a hundred dollars in four twenties and two tens.  She wrote out a check, and we went through the drive-through and withdrew it.

Puiatti said that he drove the car northbound until he found a dirt road

7

through orange groves near Dade City, Florida. Puiatti drove the car through the dirt road until he saw a street, then turned around and stopped the car about halfway down the dirt road. Puiatti said they let Ritchie out of the car and, at her request, gave Ritchie her purse and her husband's baseball glove. They took her wedding band and diamond ring.

Puiatti and Glock jointly described how Glock suggested shooting Ritchie, how Puiatti fired the first two shots, and then Glock fired the rest, as follows:

> By Detective Stahl: Question: Then what happened when you let her out of the car?
> Mr. Puiatti: Okay. We left her and started to take off. And as we were taking off, we started talking back and forth, and Robert said to me that he thought that we should shoot her. And after going back and forth a little bit, I agreed, and turned the car around.
> Then we drove up next to her and acted like we were looking for directions, and I shot her in the right – right by the right shoulder, and drove off.
> When I was driving off, Robert noticed that she was still standing.
> Mr. Glock: There were two shots fired at her, and then – interrupted –
> Mr. Puiatti: You tell it.
> Mr. Glock: When we first turned around and came back toward her on the first time, he shot the first time and hit her in the shoulder, the right shoulder, and then fired a second time. I don't know if the second time he hit her or that was when he missed her and hit the tree or whatever.
> Mr. Puiatti: Yeah.
> Mr. Glock: I don't know if he missed the second shot or not.
> Mr. Puiatti: Yeah. It was because – interrupted –
> By Detective Stahl: Question: You agree with that, Carl?
> Mr. Puiatti: Yeah.

8

Question: Go ahead, Bobby.

Mr. Glock: Then we kept on driving, and I noticed that she was still standing. Carl turned around and handed me the gun at that time and drove back by her, and I fired a shot. No, I fired two shots at that time.

Mr. Puiatti: Yeah.

Mr. Glock: I fired two shots. Uh, then we kept on driving back by, turned around again, (pausing).

Mr. Puiatti: Went back by again, stopped, (pausing).

Mr. Glock: Yeah. Stopped and turned around and headed back toward her.

Mr. Puiatti: (Affirmative nod.)

Detective Wiggins: She was still standing?

Mr. Glock: I only fired one shot at that time. Only fired two shots the whole time.

Mr. Puiatti: Three.

By Detective Stahl: Question: I just want to interrupt you. Carl, at the time when you said you shot her once in the shoulder, then you shot in the chest; didn't you?

Mr. Puiatti: Yes, I shot her twice.

Mr. Glock: It was the third shot that you missed.

Mr. Puiatti: So those first two, yeah.

Question: So you shot her twice, Carl.

Mr. Puiatti: Yes.

Question: Once in the shoulder, you said (interrupted).

Mr. Puiatti: And once in the chest area.

Question: Chest. And how many times – how many shots did you – (interrupted.)

Mr. Glock: Two.

Question: So how many shots in total did you fire?

Mr. Glock: Me?

Question: Yeah.

Mr. Glock: Two.

Question: And – (pausing)

Mr. Puiatti: Altogether, five. One missed.

Question: One missed. So that was a total of five shots?

Mr. Glock: The sixth shot got hung up in the gun and we didn't worry about it.

9

Question: Okay. And how many times did you go back now?

Mr. Glock: We passed by her once – twice – three times.

Question: Three times you went back and on the third time what happened?

Mr. Glock: That's when I fired my second and final shot, and that's when she – as we were driving away after the last shot, she fell over.

Mr. Puiatti: She walked about ten yards and then fell over.

(Emphasis added).

Afterward, Puiatti said they drove to Ocala, Florida, where they pawned Ritchie's rings for $200, drank beer and played pool. Puiatti and Glock drove to Columbia, South Carolina, where they visited Glock's sister and a friend of Glock's, and then they went fishing. Glock pawned the CB radio from Ritchie's car for $20. They drove north until they were stopped and arrested on the New Jersey Turnpike.

Puiatti and Glock identified several pieces of physical evidence collected by police: the hundred-dollar check, Ritchie's purse, pawn tickets, the murder weapon (the .38 pistol) and the other firearm recovered from Ritchie's car. Puiatti and Glock were asked if they had anything else to say, and they averred that their crimes occurred as they described them and they were in full agreement with each other's statements:

Question: All right. I have nothing more to say. Do you have anything to add, Carl Puiatti, to the statements made?

Mr. Puiatti: Just that I have been treated very fairly by the two

10

detectives and, umm, everything I've said is the truth and the exact way that it happened.

By Detective Stahl: And, Robert Glock, is there anything that you want to add?

Mr. Glock: Just the same thing that Carl just answered.

By Detective Stahl: Question: All right. <u>And are you both in full agreement with each other as to the statement you've made, that the incident came down exactly that way?</u>

<u>Mr. Puiatti: Yes.</u>

<u>Mr. Glock: Yes.</u>

(Emphasis added.)

After presenting the court reporter's testimony reading the defendants' joint confession, the State introduced into evidence two checks, Ritchie's two rings, and the vehicle registration for Ritchie's car. Then the State rested.

Neither Puiatti nor Glock presented evidence. In their closing arguments, they did not contest guilt on the kidnaping and robbery charges, but argued the evidence merited a conviction for second-degree murder, not first-degree murder.

The jury's verdict found Puiatti and Glock guilty of first-degree murder, kidnaping, and robbery with a firearm. The State presented no evidence in the penalty phase.[3]

## D.    Glock's Penalty Phase Evidence

---

[3]Before the defendants presented their penalty-phase evidence, Puiatti's counsel inquired whether the state trial court would permit the defendants' family members who were present during the guilt phase to remain in the courtroom for the penalty phase. The State argued the rule of sequestration applied in the penalty phase. Glock's counsel concurred. The state trial court ruled that the rule of witness sequestration applied.

11

Glock first called Dr. Gerald Mussenden, a clinical psychologist, who examined Glock in jail. Dr. Mussenden testified Glock was reading at a ninth-grade level, had impressive spelling and relatively strong math skills, and was "functioning at his level of intelligence." Dr. Mussenden did not state what Glock's IQ was, but he testified that Glock was "in the average range of intelligence." Dr. Mussenden testified that Glock: (1) had "moderate personality skills implying that he had some adequate control and inhibitions"; (2) had "some ability to relate to people in a friendly, sociable manner" and was "fairly objective in what he perceives"; (3) was "sensitive to others" and "certainly likes to receive some kind of affection"; (4) had "good feelings for guilt or remorse and does experience conflicts of his behavior"; (5) had "a strong desire to relate to people" and (6) would have liked, in the past and the present, to "have a better relationship with his family and with others." Dr. Mussenden found these difficulties in Glock's personality, including that he: (1) had "difficulty relating to authority, whether it's male or female"; (2) had "a problem relating to women" in general; (3) had "a very poor self-concept, extremely sensitive to his height or shortness"; (4) felt "very bad about who he is[,] . . . what he's not done to date[, and] . . . like a failure"; (5) had "some self-destructive tendencies" that he "turns . . . on himself" when he is angry and (6) was "also . . . somewhat easily led," and "somewhat

12

easily influenced by someone who would want to be friendly and create an atmosphere where he could feel comfortable."

Dr. Mussenden also opined that at the time of Ritchie's murder, Glock was "cogn[i]tive," "knew right from wrong," "could appreciate the quality of his behavior," and had reached a "culmination of a history of problems" Glock had had for years. Dr. Mussenden described Glock's background problems: (1) his father left when he was two years old; (2) Glock was "extremely disruptive," which Dr. Mussenden attributed to poor parenting; (3) at the age of 13, Glock was sent to live in an institution, which Dr. Mussenden described as "the ultimate rejection . . . for any child to experience"; (4) Glock was sent to live with his father at age 14, which did not work out well, causing additional feelings of failure; (5) Glock later joined the military, but again had problems; and (6) Glock left the military and worked a variety of jobs that "didn't work out very well." At that point, at age 22, Glock "no longer had a job, had bills, [and] couldn't go home to his father, to his stepmother." Glock met Puiatti and they developed a comradeship in part because Puiatti "would pay attention to him, . . . was willing to give him some support, and . . . understood the problem." Glock "could identify with Puiatti because [Puiatti] was also without a job and [had] no place to go."

According to Dr. Mussenden, the murder of Ritchie was an expression of

13

Glock's anger toward women and Glock's feelings of failure and rejection all his life. Dr. Mussenden added that murder was not something Glock normally would have thought of or done. According to Dr. Mussenden, although Glock had a high level of family discord, he showed few or no signs of sexual deviancy, antisocial personality, or impulsiveness. Glock "basically doesn't have a criminal profile." Dr. Mussenden opined that Glock had a very good potential for rehabilitation because he was young, fairly intelligent, had feelings of guilt and conflict about his behavior, and was not as prone to destructiveness toward others as he was to self-destructiveness.

During the State's cross-examination, Dr. Mussenden testified that Glock had problems relating to female authority figures, which made him more likely to choose a female victim for a crime. Dr. Mussenden stated that Glock "would follow anyone who appears to be fairly assertive and will give him a minimal amount of attention," and "[s]hould this person be involved in any type of anti-social behavior, [Glock] may be a quick subject to follow," though "[i]t would depend on the act itself." Dr. Mussenden testified that Puiatti "gave [Glock] the type of things he was craving for." When asked whether it was fair to say Glock and Puiatti each gave the other something the other needed, Dr. Mussenden stated he would "imagine that if [Puiatti] also had similar needs or anything similar to

14

that, then, yeah, they may have been able to support each other and felt very comfortable with each other because of their deficiencies." Dr. Mussenden admitted there was "a contradiction" between the facts of Glock's and Puiatti's abduction and murder of Ritchie and Dr. Mussenden's conclusion that Glock was not destructive to others. Dr. Mussenden stated that he thought "a possible explanation, the only explanation I have[,] is that had [Glock] not had this association that he made on the date of this crime, he would not have been involved in this incident, such an act. This is a really bad, destructive association."

On cross-examination by Puiatti's counsel, Dr. Mussenden was asked if his findings were consistent with the fact that it was Mr. Glock's idea to shoot Ritchie.[4] Dr. Mussenden answered that it would be atypical behavior for Glock, and Dr. Mussenden still believed Glock "would need someone else to do something of this nature." However, Dr. Mussenden admitted his conclusions did not negate the possibility that it was Glock's idea to commit the crime, or that it was Glock who fired the final shot at Ritchie.

Glock called his stepmother, Willie Mae Glock. Mrs. Glock testified about how she and Glock's father (her husband) found Glock in an orphanage when he

---

[4]The State objected that the question was a hypothetical based on facts not in evidence. After reviewing the joint confession transcript, the state trial court overruled the State's objection.

15

was fourteen and got legal custody of him. Mrs. Glock testified that she talked to Glock while he was in jail awaiting trial for Ritchie's murder, and that Glock was "[v]ery depressed," "sorry that it happened," and "mostly fe[lt] sorry for the family that it happened to." Mrs. Glock did not believe Glock "intentionally [did] it" because it was "not [Glock's] nature." Glock was more of a follower than a leader.

On the State's cross-examination, Mrs. Glock admitted that Glock had a problem with anyone telling him what to do because he "never had anyone to discipline [him] or teach him right from wrong." Glock "has had to survive any way he could ever since he was eight years old. He had no mother or father. He's had to survive the best way he knew how." Puiatti had no questions for Mrs. Glock.

Glock called Tammy Yonce, Glock's sister, to testify. Yonce testified that her and Glock's mother was "a committed alcoholic" who physically and mentally abused Glock and Yonce until a court removed Glock from the home and put him in an orphanage when he was about thirteen years old. Their mother beat Glock almost daily for minor infractions, called him names, "did not approve of who he was" and "did not like him because of who his father was." Glock's mother later disowned him.

Yonce also testified that Glock told her several times that he was sorry for

16

killing Ritchie, that he wished he had not killed her, and that he did not intentionally do it. Yonce characterized Glock as more of a follower than a leader.

Glock's counsel then called Glock to testify.[5] Glock testified that he felt "a lot of remorse and more or less sorrow" for "the victim and her husband." Glock was 22 years old and had never been convicted of a crime before. Glock had a "very hectic" relationship with his mother and he "never really had a relationship" with his father, although there were "good feelings between us." Glock had had no disciplinary problems while in jail. Glock was "sorry about what happened. If there was anything I could do to bring her back, I would do it."

Neither the State nor Puiatti's counsel cross-examined Glock. Glock then rested.

### E. Puiatti's Penalty Phase Evidence

Puiatti's first witness was Dr. Donald DelBeato, a forensic psychologist, who examined Puiatti. Dr. DelBeato felt comfortable enough with Puiatti during the examination that he removed Puiatti's manacles and asked the accompanying deputy to leave them alone in the room together. In the interview, Puiatti "tended to underplay" his drug usage, but Dr. DelBeato learned from the interview and other information that Puiatti had used marijuana regularly for several years and

---

[5]Puiatti's counsel renewed Puiatti's motion to sever the penalty phase, which the state trial court denied.

also used LSD and some cocaine. In his personality profile and clinical interview, Puiatti was, in Dr. DelBeato's opinion, being truthful.

Dr. DelBeato opined that Puiatti was "a rather insecure young man" with "an inability to sometimes deal with stress and react appropriate[ly]." Dr. DelBeato found no antisocial tendencies. Puiatti was remorseful for Ritchie's murder. Puiatti scored a 95 verbal IQ and a 78 performance IQ. Dr. DelBeato testified that "if we were in school and the teacher wanted to know what [Puiatti's] IQ is, I would say he would probably be average."

Although Puiatti's remote and recent memory were normal, Dr. DelBeato found there was "a dysfunction to the right hemisphere of [Puiatti's] brain," in the frontal or frontal parietal area which is the emotional center of the brain. Puiatti had impairments in concentration and patience. Puiatti had "emotional instability syndrome," which "could make him edgy, moody, and not know why or [be] easily influenced."

According to Dr. DelBeato, Puiatti's dysfunction expresses itself when Puiatti is under stress or under the influence of alcohol or some other toxin. As a result of his brain dysfunction, Puiatti is "[v]ery easily manipulated." Puiatti is "more easily aggressive, more easily violent, more easily influenced, edgy, . . . may do something that [he] ordinarily would not have done, to make unusual

18

choices." Dr. DelBeato opined that at the time of Ritchie's murder, Puiatti was under stress, and as a result he "would have been more easily dominated by another individual" and "more likely to do something that he would not normally do or that he would not do if he were alone."

On cross-examination by Glock's counsel, Dr. DelBeato admitted that (1) most people are more easily influenced when they are under stress, (2) whether Puiatti was influenced by Glock depends not only on Puiatti's psychological profile, but also on Glock's, and (3) Dr. DelBeato never examined Glock.

On the State's cross-examination, Dr. DelBeato clarified that his opinion was that there was "a very good probability" that Puiatti's right-side brain dysfunction affected his behavior during his kidnaping and murder of Ritchie. Dr. DelBeato could not say with certainty that that was the case because in his profession, "there are no certainties." Dr. DelBeato also could not say with certainty that Puiatti was under extreme duress or the substantial domination of another person, but only that Dr. DelBeato's diagnosis was that Puiatti "could have been easily influenced." Dr. DelBeato testified that Puiatti's conduct as to Ritchie would likely not have been the same had Puiatti been by himself. Dr. DelBeato opined that Puiatti could appreciate the criminality of his conduct, but was, within a reasonable probability, substantially impaired in his ability to conform his actions

19

to the requirements of the law "because of the way the damage that is there [in Puiatti's brain] affects aggressiveness."

Puiatti called his mother, Linda Puiatti. Mrs. Puiatti testified about Puiatti's childhood in New York and how Puiatti befriended other children who were picked on by other kids, how he started working in the family's deli business after school when he was 12, until the family had financial troubles and lost the business. At age 16, Puiatti started "hanging around with the wrong crowd" and using drugs. Puiatti's family got Puiatti to see a counselor about his problems, but eventually they could not afford the cost.

The Puiatti family moved to Florida to get a new start. Puiatti quit school when he was 16. When his mother tried to get him to go back, Puiatti told her the family needed him to get a job more. Puiatti later joined the Army to better himself. Puiatti had trouble keeping up in the coursework he had in the Army, and he continued to use drugs. Puiatti requested and received an honorable discharge from the Army. He returned home and found a job, where he met his future wife.

After Puiatti, at age 19, married, his relationship with his wife was one "of constant fighting." In all Puiatti's arguments with his wife, he never struck her. Puiatti had financial trouble and for a time had to move, with his wife and her daughter, to live with Puiatti's parents. Later Puiatti was arrested for helping a

friend commit a burglary. While Puiatti was on probation, Mrs. Puiatti tried to get him help for his continuing drug problem.

Puiatti and his wife had a baby boy who was born two months premature and who died after two months. By the time the child was born, Puiatti's wife had met another man, and she would not let Puiatti see their son. Puiatti never saw his child in person, though he got a photograph that he carried with him.

Puiatti became very troubled after the death of his baby son. Puiatti also suffered constant chronic chest pain. Puiatti's teeth hurt, too, but he could not afford to see a dentist. Puiatti continued with his drug use and lacked motivation to do anything with his life. Puiatti moved in with his parents and could not find a job.

Mrs. Puiatti testified that up until the time Puiatti was arrested for Ritchie's murder, he was not violent. Instead, Puiatti "demonstrated a lot of love to us, a lot of caring, a lot of helping, trying to help us through our difficult financial time."

Puiatti's next witness was his sister, Angela Thatcher, who became aware that Puiatti was using drugs when he was about 14 or 15 years old. Puiatti became very moody and "very obnoxious at times." While growing up, Puiatti tended to befriend misfits. Puiatti was never violent. Although Thatcher and Puiatti "argued as brother and sister will, . . . he always verbally abused but never physically – he

21

never struck out or hit anybody in our family or anyone else to my knowledge."

Over the past few years, Puiatti became depressed, but in the last year before his arrest he "was starting to make a new start for himself." Puiatti "was really into working as a chef." Puiatti told Thatcher he was "trying to lead the more or less straight and narrow path and not get into any more trouble." Thatcher "found it hard to believe and, yet, I tried to believe it, because I wanted to hope that he would change and that he would get his life together and get on the right track." Puiatti "was very depressed over the death of his son and . . . felt very tormented that he had never seen the child."

Puiatti called his father, Victor Puiatti, as a witness. Victor Puiatti testified that in the months before the murder, Puiatti was under a lot of pressure from his probation officer to pay back an outstanding fine:

> [Puiatti] had to pay a fee once a month of ten dollars to the probation department, and I used to take him down to pay this money, and there was an outstanding fine of a thousand dollars to be paid within a few months. My son was having a hard time making, seeing to it that this was being paid. On one occasion we went down to pay the ten dollars on the third of the month, and the probation officer said that being as he was behind it looked like that he wasn't going to pay this, and I assured him that he was going to pay it, and that I was going to help him pay this. And he said, "Well, if you don't pay it, I can assure you that I personally will see that you get fifteen years in prison out of this," which upset him, my son and myself, very much.

Puiatti was doing his best to pay the fine on time, but he had trouble getting to

work because he lost his driver's license after he got a series of tickets.

In the months before the murder, Puiatti was also very depressed. After his son died, Puiatti was increasingly depressed and stayed in his room most of the time. Puiatti said he should be dead with his son. One time during that period, Victor Puiatti got angry at Puiatti for his negative attitude, raised his voice at Puiatti, and shoved him. Puiatti did not strike out, instead telling his father that if it would make him feel better to hit Puiatti, to go ahead and hit him. Victor Puiatti spoke to Puiatti after Ritchie's murder, and his son was truly remorseful for what happened.

Puiatti's final penalty-phase witness was psychiatrist Dr. Richard Meadows. Dr. Meadows examined Puiatti, spoke to Puiatti's family members, reviewed Dr. DelBeato's findings, and reviewed materials from the case, including Puiatti's confessions. Dr. Meadows performed a mental status examination on Puiatti and spoke with Puiatti about his mental condition, legal circumstances, background, and psychiatric and medical history. Dr. Meadows found Puiatti truthful during the evaluation.

Dr. Meadows concluded that Puiatti suffered from "several mental illnesses," including avoidance personality and addiction to alcohol and marijuana:

> I was of the opinion that [Puiatti] was suffering from several mental illnesses as well as a history of some physical illness. I thought that

23

he had an emotional problem that we label as avoidance personality. In the older diagnostic manuals, that was called inadequate personality. I thought from reviewing Dr. DelBeato's reports and my own impressions in talking with Carl [Puiatti], it was highly suspect that he may have some brain damage. Um, he had a history of several head injuries in which he probably had a concussion. Whether or not there was any lasting damage from this, I would not be able to say. He had a history of having had suffered pains in his face and head from teeth problems, and he had a peptic ulcer approximately a year or so before. . . . I feel he also had a severe dependence. Some people would call it addiction, some dependence – depending on which diagnostic frame you're talking about – on alcohol and marijuana.

Dr. Meadows described avoidance personality as "an extreme sensitivity to feelings of rejection by other people" and a tendency to misinterpret other people's comments as a criticism of oneself. Dr. Meadows described people with avoidance personality as being "suggestible or influenced easily by other people":

They appear to be shy, although very often they will very much like to be more involved with people. They have a tendency to wish to have an unconditional acceptance by other people. Um, they have a very poor image of themselves. They often tend to be very self-critical. They tended to be suggestible or influenced easily by other people. They tend to depend on other people for approval to make them feel secure and comfortable and good about themselves. And, also, they tend to depend on other people for their care and security, um, and these are tendencies to want to lean on somebody or need somebody else's approval. That is a rather extreme degree, usually.

Dr. Meadows also explained the basis for his suspicion of possible brain damage:

I felt in talking with Carl [Puiatti] that there were a number of things about the way he said them and what he said that indicated to me in a

24

very subtle way that there was the possibility of his having brain damage. The We[chs]ler Adult Intelligence Scale that Dr. DelBeato administered showed a wide difference in verbal and performance aspects on this test, and it's been, um, I don't recall in my experience that I've ever seen somebody with that wide a spread of differences in their ability to deal with the verbal part and the performance part who did not have some sort of brain damage. Um, the other things that concerned me [were] the, if his history is accurate, of the very large amounts of marijuana that he had used over the years, plus the alcohol, led me to suspect that you do get death of brain cells with alcohol and you get seven or eight times that high of a rate of death of brain cells with marijuana.

Um, added to this with the indication of emotional instability, poor judgment, poor impulse control – these would all go along with damage in the brain[,] particularly in these right frontal regions.

Dr. Meadows opined that Puiatti's right-side brain damage probably contributed to Puiatti's increasingly impaired judgment:

[Puiatti] seemed to have the left brain function more preserved than the right. This would lead me to think that it was probably a contributory factor in the increasingly impaired judgment that he couldn't stand tension as easily. He was more impatient – more emotionally unstable – that his reality testings [were] not always that good.
. . . .
. . . I think this would cause a progressive[] deterioration in his judgment which would fluctuate depending on the amount of stress he was under.

In Dr. Meadows's opinion, Puiatti suffered from "a progressive brain damage . . . probably due to the use of pot and alcohol – more likely that than the head injuries that he had, and that played a part in it and made him . . . less stable." Dr. Meadows opined that Puiatti, on an emotional level, functioned like a child of 10

25

or 11.

Dr. Meadows also explained what factors in Puiatti's history led to Dr.

Meadows's diagnosis of avoidance personality:

> I think Carl [Puiatti] . . . started life with some potential and interests
> and assets and things going for him, but problems showing up very
> early in his childhood and then he experienced a series of rather major
> traumas throughout his life.  One was in addition to that a number of
> ongoing ones, um, such as getting rheumatism when he was eleven or
> twelve and not being able to follow a professional sport career as he
> very much had his heart set on.  I think he was going down the tube
> socially, scholastically and [in] other areas when he was around
> fifteen or sixteen with family problems with finances.
>> At that point the family moved to Florida.  I think he got his
> hopes up about getting another start when he joined the service.  I
> think this was another discouraging, disheartening experience for him.
> Um, and I think things continued from that point on progressively
> after he left the service to become just one series of boon-dogglings in
> practically every area of his life that gave him more and more of a
> sense of depression, futility, numbing out his feelings, functioning
> less and less effectively in every area of his life, and this pattern
> continued almost progressively downhill until the time of the tragedy
> that brought us here.

Dr. Meadows opined that Puiatti's life showed a pattern of disintegration over the

year or more leading up to Ritchie's murder:

> He was still in his early twenties, unable to break the apron strings and
> function independently.  He was living in and out of his parents'
> home, he was unable to work continuously and hold a job.  He was
> relying heavily on alcohol and pot.  He was still following his pattern
> of taking in outcasts or people that were kind of misfits where he felt
> he would be accepted.  His marriage was breaking up, um, he had a
> great deal of investment in the child that was born of that marriage.
>> I think the death of that child and not being able to see the child

26

added to his burdens – economic problems mounted. I think he felt under pressure to make payments in a number of areas, um, I think he felt pressure from his probation officer, um, he got in more and more jams with DWI's, lost his driver's license, um, he was concerned about causing, you know, more problems at home with his younger brother who was also in the middle of all this family turmoil where his folks were trying to help him and his wife out, plus this other fellow that they took in under their wing, the younger brother – he felt very close to – was having some kind of educational difficulties requiring special attention.

. . . .

. . . [T]his concatenation of events that kept escalating, I think, led him to feel more and more . . . a sense of futility and depression. There was suicidal ideation, there was development of an ulcer which is the same thing which has been repeated psychologically earlier when he was in his teens when he felt life was futile.

Dr. Meadows testified that just prior to the crime, Puiatti was at his lowest point psychologically. For many years Puiatti had used marijuana and alcohol heavily. Then Puiatti went three or four days without any marijuana, which could cause "an intense psychological withdrawal experience that's very unsettling to some people."

Dr. Meadows testified that Puiatti's personality profile was not one of a violent person. Dr. Meadows explained:

[Puiatti's] rearing . . . imbued [him] with a rather strong moral code which would not permit him in good conscience to do harm to other people. He was not the sort of person who seemed to enjoy hurting other people. He had always avoided open conflict to a great extent – go to his room and pound on a pillow, get drunk, withdraw, play music in his room, um, he had none of the – well, people who usually get violent who have emotional problems tend to be more of a

27

paranoid schizophrenic or anti-social diagnostic groups. He fit none of these categories. He has none of these indications that I can see of people who most usually, if they're not a professional criminal get into violence because of, um, the urge to be in control or dominance of somebody else or to evince some hostility or some perverse cruelty to somebody else.

Dr. Meadows further opined that Puiatti had "a number of things going for him on the plus side that would argue in favor of rehabilitation." Dr. Meadows believed Puiatti (1) felt genuine remorse at what he'd done and (2) would be able to function and improve himself within the structured confines of the prison system.

Dr. Meadows also believed Puiatti was easily influenced and under the substantial domination of another person at the time of Ritchie's murder:

> Q. Now, another question that's important for us here today is whether [Puiatti] was suffering from the substantial domination of another person. What is your opinion about that – whether he was at the time of the crime for which he has been convicted?
> A. I thought so.
> Q. Can you tell us why?
> A. I think it's in his nature to be easily influenced. I think it's a very scary thing for him to do anything which causes somebody else to disapprove or to stand up for himself against them. And as I understand it from the way events were transpiring, he was being leaned on rather heavily, um, by the co-defendant.
> Q. Would this be a function, again, of both [Puiatti's] mental illness and the brain damage, the brain dysfunction that you have described?
> A. I think so. I don't think you can really separate the two at this point. I couldn't give you a percentage, but I think they continuously operate together.

Dr. Meadows characterized Puiatti's mental state at the time of the crime as

"substantially impaired":

> Q.     Okay.  Do you have an opinion as to whether the capacity of [Puiatti] to appreciate the criminality of his conduct and to conform his conduct to the requirements of law was substantially impaired at the time of the crime?
> A.     I thought it was substantially impaired at that time, yes.

Glock's counsel then briefly cross-examined Dr. Meadows, asking only three questions.  Dr. Meadows admitted that whether Puiatti was under the substantial domination of another person at the time of the crimes might depend on the psychological profile of the other person.  Dr. Meadows had not performed any tests on Glock or seen any psychological testing reports on Glock.

At the close of evidence, Puiatti renewed his motion to sever, which the state trial court denied, stating:

> [T]his is the classic example of why joint defendants ought to be [tried] together in order to get justice.  If there are no overriding reasons for separating them like [Bruton] testimony or something like that, I really am convinced even more so now than at the time I made the ruling that the denial of the motion to sever was correct.

## F.     Penalty Phase Arguments and Verdicts

In the penalty phase closing arguments, the State discussed the testimony of the three mental health experts retained by the defendants, and agreed defendants Puiatti and Glock were both followers, not leaders:

> [T]hese guys are like – two peas in a pod – the old cliche, as alike as two peas in a pod.

What did the doctor say about them from the tests and from what other people say? They both have average intelligence, memory, both of them notwithstanding what counsel has tried to get across through their witnesses, both of them apparently are heavily dependent on other persons. They're followers[], not leaders.

One of the questions I asked was would either one of these have been likely to do this crime by themselves. The answer was no – so, I would submit to you, thoroughly from the evidence, there's no reason to treat them any differently. I think that's what the evidence indicates. They are very, very, very similar.

I think some of the high school biologists talk about symbiotic relationships, one that depends on the other – they wouldn't have taken this woman by themselves. They needed the other one to boo[s]t his bravery, to make him do things he wouldn't ordinarily do or actually do – the thing that he wouldn't have the guts to do ordinarily. That's what, they's why they got together.

Glock's counsel argued, among other things, that Glock committed the crime while under extreme duress. Glock's counsel did <u>not</u> argue Puiatti dominated Glock. Rather, Glock's counsel rested his closing argument on the duress prong of the statutory mitigating factor in Fla. Stat. § 921.141(6)(e),[6] not the domination prong:

> The third [mitigating] factor, the defendant acted under extreme duress or under the substantial domination of another person. There's two ways there can be substantial domination of another person or extreme duress, and I submit to you that when you look at the facts that you heard from all the doctors, the facts of the incident, what was building up in Mr. Glock, a mixture of Mr. Glock and Mr. Puiatti, mixed together – those two personalities and <u>I'm not saying that he</u>

---

[6]One statutory mitigating circumstance in Florida is that "[t]he defendant acted under extreme duress or under the substantial domination of another person." Fla. Stat. § 921.141(6)(e).

30

> was dominated or there was substantial domination [of] Mr. Glock. What I'm saying is that it's a mitigating circumstance and is applicable because he was under extreme duress based on the totality of the circumstances and some weight should be given to that mitigating factor for that purpose.

Glock's counsel also argued that Glock's criminal conduct was the result of circumstances unlikely to reoccur. Glock's counsel stated that "this whole thing was brought about to a great degree by the bad, destructive association between these two personalities. It's just something that occurred. It's wrong, it doesn't justify it, but it's not likely to occur again."

In closing, Puiatti's own counsel argued that neither Puiatti nor Glock would have committed the murder without the other:

> The family also said that Carl [Puiatti] was attracted to misfits and when asked a question by [the State] whether Carl was perhaps one of those himself, Mrs. Puiatti said she wouldn't deny that he had problems. Nonetheless, misfits, both of them misfits. This is a form of mitigation. Neither of them apparently – I didn't know about Mr. Glock until I came to this Courtroom, but neither of them apparently would have committed a violent act but for the other. And this factor is also a form of mitigation.

Puiatti's counsel referenced Dr. DelBeato's testimony that Puiatti showed a "flat affect" – that he felt strong emotions but did not show them outwardly – and that Dr. DelBeato and Dr. Meadows testified that Puiatti was being truthful and was remorseful. Puiatti's counsel then stated that "[t]his is more dependable than any display of emotion that Carl [Puiatti] might put on to you on the witness stand,

31

although we know from the doctor's testimony that he's not capable of that kind of show."

Puiatti's counsel further argued that Puiatti was under an extreme emotional disturbance and extreme duress at the time of the murder. His counsel argued Puiatti was not "absolutely responsible because half of his brain is functioning in an impaired way and because of the extreme disturbance that he was under personally." Puiatti's counsel did not argue Puiatti was substantially dominated by Glock.

By an 11 to 1 vote, the jury recommended the death penalty for Puiatti. By an 11 to 1 vote, the jury recommended the death penalty for Glock, who was executed in 2001.

## G.     1984 Sentencing Hearing

On May 4, 1984, the state trial court held a joint sentencing hearing for Puiatti and Glock. Puiatti called three witnesses. Chuck Norman, Puiatti's first witness, was a volunteer who conducts weekly group discussions on alcoholism and drug abuse in the jail. Puiatti voluntarily attended every meeting except for one when he had the flu. Over the course of eight months, Norman noticed a "definite change" in Puiatti. Puiatti began to open up about his own history of drug and alcohol abuse, and doing so had an effect on the other inmates and on

32

Norman himself.

Puiatti's other witnesses were Dr. DelBeato and Dr. Meadows. Both experts reiterated their penalty-phase testimony. For example, Dr. DelBeato again opined that Puiatti had right-brain dysfunction that was highly related to stress that Puiatti was under, with the "higher the stress, the lower his ability to behave correctly." Dr. Meadows testified about Puiatti's right-brain dysfunction, which he believed was likely caused by alcohol and drug use, and about Puiatti's psychological stressors at the time of the murder. Puiatti's counsel then argued.

Puiatti himself made this statement:

I know I'm here this morning to be sentenced for the crime of first degree murder. A crime I am deeply ashamed of.

Your Honor, as I've laid down to sleep each night these past eight months, there's one question above all others that makes me – to find it difficult to fall asleep. And that question is, why didn't I keep driving away after I dropped Mrs. Richie off in the orange grove.

And to be perfectly honest with you, Your Honor, <u>I really don't know why I let myself be talked in to going back and shooting this woman.</u>

When I drove into the orange grove, the only thing I had on my mind was dropping her off somewhere, where it would take her a while to get to a phone or get to some people. So I could get away. Not killing her.

All I had to do was keep going like I was after I dropped her off, and she would still be alive today.

But as much as I truly wish I could, I cannot change that.

Your Honor, as I'm sure you can see from my P.S.I., it's not my nature to commit violent crimes, or to be violent and this sort of thing was totally out of character for me.

Another thing that was giving me much grief and sadness over

these past eight months, is the way I have disgraced my family
through what I've done.

. . . .

I love and care for them very much, and pray that I never hurt
them again.

(Emphasis added.) Puiatti recounted his progress with Alcoholics Anonymous and

believed he could be rehabilitated in prison. Puiatti explained his remorse for the

pain he had caused Ritchie's husband.

The state trial court sentenced Puiatti and Glock to death, stating:

On the charge of murder in the first degree, it is the sentence of this
Court that you each be put to death according to the law. And in
reaching that sentencing judgment, I find three aggravating
circumstances.
First is that the capital felony was committed for the purpose of
avoiding a lawful arrest, or effect escape from custody.
And secondly, that it was committed for p[ec]uniary gain.
And third, that this capital felony was a homicide and
committed in a cold, calculated and premeditated manner, without any
pretext of moral or legal justification.
I find a mitigating factor for Mr. Glock, that he had no
significant history of prior criminal activities.
I find no mitigating factors for Mr. Puiatti.[7]
And in weighing this mitigating factor that I find for Mr. Glock,
and the aggravating factors that I find, I'm convinced that the sentence
of death is mandated by Florida law.

The state trial court sentenced Puiatti and Glock to life imprisonment for their

---

[7]Puiatti had two prior felony convictions, for burglary of a dwelling and for introduction
of contraband into a county facility. In the penalty phase, the State did not introduce evidence of
Puiatti's prior convictions because Puiatti agreed to waive any argument that the mitigating
factor of no significant prior criminal history applied.

robbery and kidnaping convictions.

## H.    Direct Appeal

Puiatti appealed to the Florida Supreme Court, raising eight issues. See

Puiatti v. State, 495 So. 2d 128 (Fla. 1986) ("Puiatti I"), vacated and remanded by

Puiatti v. Florida, 481 U.S. 1027, 107 S. Ct. 1950 (1987). As to his motions to

sever, Puiatti argued that the state trial court abused its discretion in refusing a

severance because the joint trial prejudiced Puiatti. Puiatti argued that the

prejudice accrued from three primary sources: (1) antagonistic post-arrest

statements; (2) inconsistent and conflicting penalty phase defenses; and (3) penalty

phase jury instructions and prosecutorial comments that were relevant to Glock's

case but prejudicial error as to Puiatti.

The Florida Supreme Court affirmed Puiatti's convictions and death

sentence. Puiatti I, 495 So. 2d at 129. As to guilt-phase severance, the Florida

Supreme Court held that Puiatti's constitutional right to confrontation under the

Confrontation Clause and Bruton[8] was not violated by the introduction of Glock's

individual confession implicating Puiatti because Puiatti also confessed, Puiatti's

and Glock's individual confessions were interlocking, and their subsequent joint

confession reconciled any minor differences in their individual confessions:

---

[8]Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620 (1968).

35

We find that <u>Bruton</u> is not applicable under the facts of this cause, concluding that <u>Parker v. Randolph</u>, 442 U.S. 62, 99 S. Ct. 2132, 60 L. Ed. 2d 713 (1979), controls this case. In <u>Parker</u>, the United States Supreme Court held that <u>Bruton</u> does not require reversal of a defendant's conviction <u>when the defendant himself has confessed and his confession "' interlocks' with and supports the confession of his codefendant."</u> <u>Id.</u> at 64, 99 S. Ct. at 2135. Confessions interlock when the salient facts against the first defendant that appear in the confession of the second defendant also appear in the confession of the first, and vice versa. <u>United States v. Kroesser</u>, 731 F.2d 1509, 1518 (11th Cir. 1984); <u>Brownlee v. State</u>, 478 So. 2d 467 (Fla. 4th DCA 1985); <u>Damon v. State</u>, 397 So. 2d 1224 (Fla. 3d DCA 1981). These cases establish that interlocking confessions need not be identical statements; it is sufficient if the confessions are substantially consistent on the major elements of the crime involved.

In this case, Puiatti and Glock offered interlocking confessions. The initial individual confessions contained only slight inconsistencies, and each set forth sufficient evidence on the charged crimes to sustain the confessor's conviction. The fact that Glock's initial confession might have been exculpatory toward Puiatti concerning some details does not render its admission harmful when Puiatti's own confession clearly shows him guilty of the crime with which he is charged. Further, the subsequent joint confession, admitted without objection by Puiatti, reconciled the minor discrepancies of the individual confessions by Puiatti and Glock. We conclude that the trial court correctly denied Puiatti's motion for severance during the guilt phase of the trial. We emphasize that the inconsistencies between Puiatti's and Glock's initial confessions do not affect their guilt in the charged crimes since both admit they shot the victim. Each appellant is guilty of all the acts of the other in perpetrating the common criminal act.

<u>Puiatti I</u>, 495 So. 2d at 130-31 (citations omitted) (emphasis added).

As to the penalty phase, the Florida Supreme Court determined severance was not required because the jury was able to consider Puiatti's penalty-phase

36

evidence and apply the law without confusion or prejudice:

> We hold that a severance was not required in the penalty phase of the trial. As to the alleged conflict concerning which defendant dominated the other, our decision in <u>McCray</u> disposes of this contention. In <u>McCray</u> we stated:
>
>> [T]he fact that the defendant might have a better chance of acquittal or a strategic advantage if tried separately does not establish the right to a severance. Nor is hostility among defendants, or an attempt by one defendant to escape punishment by throwing the blame on a codefendant, a sufficient reason, by itself, to require severance. If the defendants engage in a swearing match as to who did what, the jury should resolve the conflicts and determine the truth of the matter.
>
> 416 So. 2d at 806 (citations omitted). <u>See also</u> <u>Dean v. State</u>, 478 So. 2d 38 (Fla. 1985). Further, we find the mere fact that only one of two codefendants has a significant prior criminal history does not require, in and of itself, a severance in the trial's penalty phase. The critical question is whether the jury was able to consider evidence presented by each defendant during the penalty phase and apply the law without being unduly confused or prejudiced. We find that, under the circumstances of this case, the jury could properly apply the facts to the law without confusion or prejudice.

<u>Puiatti I</u>, 495 So. 2d at 131 (brackets in original).

Puiatti petitioned the United States Supreme Court for a writ of certiorari. In a one-paragraph opinion, the Supreme Court granted the petition, vacated the Florida Supreme Court's judgment, and remanded the case to the Florida Supreme Court for further consideration in light of the Supreme Court's Confrontation Clause decision in <u>Cruz v. New York</u>, 481 U.S. 186, 107 S. Ct. 714 (1987). <u>See</u> <u>Puiatti v. Florida</u>, 481 U.S. 1027, 107 S. Ct. 1950 (1987). In <u>Cruz</u>, the Supreme

37

Court concluded "that, where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." 481 U.S. at 193, 107 S. Ct. at 1719 (citation omitted).[9] The Cruz Court stated, however, that "the defendant's confession may be considered at trial in assessing whether his codefendant's statements are supported by sufficient 'indicia of reliability' to be directly admissible against [the defendant] (assuming the 'unavailability' of the codefendant) despite the lack of opportunity for cross-examination, and may be considered on appeal in assessing whether any Confrontation Clause violation was harmless." Id. at 193-94, 107 S. Ct. at 1719 (citations omitted).

On remand, the Florida Supreme Court affirmed Puiatti's convictions and death sentence. Puiatti v. State, 521 So. 2d 1106, 1108 (Fla. 1988) ("Puiatti II").

_____

[9]The facts of Cruz are very different from that of Puiatti's case. Petitioner Cruz did not confess to police, and there was no joint confession as here. Rather, a non-testifying co-defendant gave a videotaped confession to police that incriminated Cruz. The trial court admitted the co-defendant's confession only against the co-defendant and instructed the jury not to consider it against Cruz. Cruz, 481 U.S. at 188-89, 107 S. Ct. at 1716-17.
At trial, a witness testified that Cruz had told him privately about the murder and that witness's testimony about Cruz's private confession "stood as the only evidence admissible against [Cruz] that directly linked him to the crime." Id. at 189, 107 S. Ct. at 1717. Further, Cruz was convicted of second-degree murder, not capital murder, and there was no penalty phase trial. See id. at 188-89, 107 S. Ct. at 1716-17; People v. Cruz, 485 N.E.2d 221 (N.Y. 1985).

38

The Florida Supreme Court pointed out that Cruz did not concern a true joint

confession by both defendants, that Glock and Puiatti's joint confession resolved

any prior inconsistencies in their earlier individual confessions, and that Glock's

individual and joint confession had the requisite indicia of reliability. Id. at 1107-

08. The Florida Supreme Court reasoned:

> As we interpret Cruz, trial courts must recognize that a nontestifying codefendant's confession in a joint trial violates the confrontation clause except in those limited circumstances where indicia of reliability can be established. Once such a confession is introduced, the reviewing court must determine whether indicia of reliability exist or whether the introduction of a codefendant's confession meets the harmless error test.
>
> We fully recognize the Supreme Court's warning about the potential damning effects of a codefendant's confession on the incriminated defendant. However, we find that the facts in the instant case are clearly distinguishable from those in Cruz because Puiatti and Glock not only entered into separate interlocking confessions, but they also subsequently entered into a joint confession resolving all prior inconsistencies. Neither Cruz nor Parker concerned a true joint confession entered into by both defendants. The joint confession, as we explained in the majority opinion, is substantially consistent with the individual confessions of Glock and Puiatti. Further, the joint confession was so interlocking, we do not believe Bruton applies because reliability was clearly established, but, even if it was error, its use with Glock's name was harmless. We find the introduction of the individual confession of Glock to be harmless error under the circumstances of this case, and it falls squarely within the harmless error situation noted by Justice Blackmun when he stated: "I fully recognize that in most interlocking confession cases, any error in admitting the confession of a nontestifying codefendant will be harmless beyond a reasonable doubt." [Parker v. Randolph, 442 U.S.] at 79, 99 S. Ct. 2142 (Blackmun, J., concurring in part and concurring in the judgment).

<u>Puiatti II</u>, 521 So. 2d at 1107-08. The Florida Supreme Court concluded that "the introduction of the individual interlocking confession of Glock and the joint confession was harmless error, even if it was error." <u>Id.</u> at 1107.

Puiatti again petitioned for a writ of certiorari. The United States Supreme Court denied Puiatti's petition. <u>Puiatti v. Florida</u>, 488 U.S. 871, 109 S. Ct. 184 (1988).

## I.    State Postconviction Proceedings

In 1990, Puiatti filed a Florida Rule of Criminal Procedure 3.850 motion to vacate his convictions and death sentence, which was denied. Puiatti's Rule 3.850 motion raised five claims, including ineffective trial counsel in the guilt and penalty phases.

Puiatti appealed the denial of his 3.850 motion to the Florida Supreme Court and simultaneously filed a state habeas petition in the Florida Supreme Court. Puiatti's state habeas petition asserted he had ineffective appellate counsel who failed to argue the joint trial violated Puiatti's constitutional right to an individualized sentencing.[10]

_____

[10]Puiatti's individualized sentencing claim – that he alleged his appellate counsel should have raised – was grounded in the Sixth, Eighth, and Fourteenth Amendments, as well as the United States Supreme Court's decision in <u>Lockett v. Ohio</u>, 438 U.S. 586, 98 S. Ct. 2954 (1978).

Puiatti's state habeas petition also claimed that Puiatti's rights were violated by the State's introduction of victim-impact and victim-character evidence at trial, and by the Florida Supreme Court's consolidated treatment of Puiatti's and Glock's claims on direct appeal.

40

The Florida Supreme Court affirmed the denial of Puiatti's 3.850 motion and denied his state habeas petition. Puiatti v. Dugger, 589 So. 2d 231, 232 (Fla. 1991) ("Puiatti III"). The Florida Supreme Court concluded that Puiatti had not shown his appellate counsel rendered constitutionally deficient performance. Puiatti III, 589 So. 2d at 235.

## J.      District Court Proceedings

In 1992, Puiatti filed a 28 U.S.C. § 2254 petition for a writ of habeas corpus, challenging his convictions and death sentence. Several times, Puiatti's case was administratively stayed pending the outcome of other state or federal proceedings. On August 14, 2009, the district court denied Puiatti's § 2254 claims as to his convictions but vacated his death sentence. Puiatti v. Sec'y, Dep't of Corr., 651 F. Supp. 2d 1286 (M.D. Fla. 2009) ("Puiatti IV"). The district court concluded that the state trial court's refusal to sever the penalty phase violated Puiatti's Eighth and Fourteenth Amendment right to an "individualized sentencing determination." The district court did not decide Puiatti's other challenges to the penalty phase, but held they were moot.[11] Id. at 1304. The State moved the district court to alter or amend its order vacating Puiatti's death sentence. The State argued that the district

_____

[11]The district court did not address these penalty-phase claims: (1) ineffective trial counsel; (2) the prosecutor's allegedly inflammatory arguments; (3) the state trial court's refusal to find certain mitigating circumstances; and (4) the state trial court's refusal to provide certain jury instructions on aggravating circumstances. Puiatti IV, 651 F. Supp. 2d at 1296-97, 1304.

41

court's failure to resolve Puiatti's remaining penalty-phase issues violated this Court's directive in Clisby v. Jones, 960 F.2d 925 (11th Cir. 1992) (en banc), that district courts "resolve all claims for relief raised in a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 . . . , regardless whether habeas relief is granted or denied." Id. at 936. The district court denied the State's motion.

The State appealed the district court's vacatur of Puiatti's death sentence and denial of the motion to alter or amend.[12] Before discussing the State's appeal, we review briefly the events in co-defendant Glock's appeals.

## K.    Glock's Appeals and Postconviction Proceedings

As Puiatti was pursuing his appeals and postconviction proceedings, his co-defendant Glock was doing the same. On direct appeal, the Florida Supreme Court consolidated Glock's appeal with Puiatti's. Glock claimed, among other things, that the state trial court erred in refusing to sever Puiatti's and Glock's penalty phase trial. The Florida Supreme Court denied Glock's claims challenging his death sentence – including his penalty-phase severance claims – for the same reasons it denied Puiatti's. Puiatti I, 495 So. 2d at 132.

Glock filed a Rule 3.850 motion for postconviction relief, which the Florida

---

[12]Both the district court and this Court denied Puiatti a certificate of appealability to cross-appeal the denial of his claims challenging his convictions. Puiatti IV, 651 F. Supp. 2d at 1319-20; Puiatti v. McNeil, No. 09-15514 (11th Cir. Jun. 6, 2010) (order denying Appellee/Cross-Appellant Puiatti's application for certificate of appealability) (unpublished).

42

trial court denied in 1988. Glock appealed to the Florida Supreme Court and filed

in the Florida Supreme Court a petition for a writ of habeas corpus. The Florida

Supreme Court affirmed the denial of Glock's Rule 3.850 motion and denied his

state habeas petition. Glock v. Dugger, 537 So. 2d 99 (Fla. 1989) ("Glock I").

In 1989, Glock filed a § 2254 petition in district court. Glock's petition

claimed, inter alia, that the state trial court erred by not granting Glock a severance

at the guilt and penalty phases. The district court denied Glock's § 2254 petition.

Glock v. Dugger, 752 F. Supp. 1027 (M.D. Fla. 1990) ("Glock II"). In doing so,

the district court concluded that Glock's Confrontation Clause rights were not

violated by admission of Puiatti's individual confession and the joint confession,

and the state trial court did not err in denying Glock's motions to sever. Id. at

1029-31.[13]

In 1994, a panel of this Court affirmed in part and reversed in part. Glock v.

Singletary, 36 F.3d 1014 (11th Cir. 1994) ("Glock III"). This Glock III decision

was vacated on April 19, 1995. Glock v. Singletary, 51 F.3d 942 (11th Cir. 1995)

(en banc). This Court en banc concluded that (1) Glock was not entitled to relief

on his Confrontation Clause claim on the merits, and (2) the non-retroactivity

principle of Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060 (1989) precluded relief

---

[13]Glock's and Puiatti's separate § 2254 petitions were ruled on by the same district court judge.

on Glock's HAC jury instruction claim. Glock v. Singletary, 65 F.3d 878, 880 (11th Cir. 1995) (en banc) ("Glock IV"). The en banc Court remanded the case to the panel to consider Glock's remaining challenges to his death sentence. Id.

On remand, the Glock panel considered those claims, which included Glock's claim "that his [death] sentence should be set aside because . . . the [state] trial court refused to sever [Glock's] sentencing proceeding from his co-defendant's, thereby depriving him of individualized sentencing." Glock v. Singletary, 84 F.3d 385, 385 (11th Cir. 1996) ("Glock V"). The Glock V panel summarily affirmed the district court's denial of Glock's penalty-phase severance claim, stating, "We find no merit in [this] . . . claim[] and therefore affirm the district court's denial of relief thereon." Id. at 386. But the Glock V panel remanded the case to the district court for an evidentiary hearing on Glock's ineffective trial counsel claim. Id. The United States Supreme Court denied Glock's petitions for certiorari. Glock v. Singletary, 519 U.S. 888, 117 S. Ct. 225 (1996); Glock v. Singletary, 519 U.S. 1044, 117 S. Ct. 616 (1996).

The district court conducted an evidentiary hearing on Glock's ineffective assistance claim and again denied the claim. This Court affirmed. Glock v. Moore, 195 F.3d 625 (11th Cir. 1999) ("Glock VI"). The United States Supreme Court denied Glock's certiorari petition. Glock v. Moore, 531 U.S. 890, 121 S. Ct.

44

213 (2000).

After the Florida governor signed Glock's death warrant, Glock filed a successive Rule 3.850 motion, which was denied in 2000. Glock appealed and filed a successive state habeas petition in the Florida Supreme Court. The Florida Supreme Court affirmed the denial of Glock's successive 3.850 motion and denied Glock's successive habeas petition. Glock v. Moore, 776 So. 2d 243 (Fla. 2001) ("Glock VII"). The United States Supreme Court denied Glock's certiorari petition and his application for a stay of execution. Glock v. Florida, 531 U.S. 1107, 121 S. Ct. 848. Glock was executed in 2001.

## II. STANDARD OF REVIEW

Because Puiatti filed his § 2254 petition before the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we review his claims under pre-AEDPA law. Turner v. Crosby, 339 F.3d 1247, 1273 (11th Cir. 2003). "Pre-AEDPA, questions of law and mixed questions of law and fact resolved by state habeas courts are reviewed de novo, while the state courts' factual findings are subject to [a] presumption of correctness." Jefferson v. Hall, 570 F.3d 1283, 1300 (11th Cir. 2009), vacated and remanded on other grounds sub nom. Jefferson v. Upton, — U.S. —, 130 S. Ct. 2217 (2010) (quotation marks omitted). We review de novo the district court's grant of Puiatti's § 2254 petition.

45

Turner, 339 F.3d at 1273. Any factual findings made by the district court are reviewed for clear error, but its legal conclusions and mixed questions of law and fact are reviewed de novo. Id.

## III. CLISBY ERROR

In Clisby v. Jones, 960 F.2d 925, 936 (11th Cir. 1992) (en banc), this Court, exercising its supervisory power over the district courts in this circuit, instructed them "to resolve all claims for relief raised in a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 . . . , regardless [of] whether habeas relief is granted or denied." Here, the district court expressly declined to reach the merits of Puiatti's penalty-phase claims other than his severance claim. The district court attempted to distinguish Clisby by reasoning that (1) the district court did not "'reserve' judgment" on Puiatti's other penalty-phase claims, as the district court had in Clisby, but "actually rendered [them] moot"; and (2) the district court in Clisby already had held an evidentiary hearing, but here the district court had not, and so Clisby's judicial economy concerns were supported by declining to reach the merits of Puiatti's penalty-phase claims.

The district court's reasoning and its resulting decision are contrary to the dictates of Clisby. Clisby's instruction to district courts was clear and contained no limitation or exception based on why a district court left some claims

46

unresolved. In fact, in two of the five published decisions cited by the Clisby Court as examples of "the growing number of cases in which we are forced to remand for consideration of issues the district court chose not to resolve," the unresolved claims were mooted by the district court's grant of the writ as to one or more claims. See Clisby, 960 F.2d at 935-36 (citing, inter alia, Wilson v. Kemp, 777 F.2d 621 (11th Cir. 1985); Blake v. Kemp, 758 F.2d 523 (11th Cir. 1985)); Wilson, 777 F.2d at 622 (district court denied all claims as to guilt phase, granted habeas relief as to sentence based on prosecutorial-comment claim, and declined to reach other claims as to sentencing phase); Blake v. Zant, 737 F.2d 925, 926 (11th Cir. 1984) (district court granted writ based on claims of ineffective assistance at guilt and penalty phases and did not decide other claims), opinion vacated by Blake v. Kemp, 758 F.2d at 523.

Further, Clisby's instruction to district courts does not turn on whether an evidentiary hearing may be required. Instead, Clisby focused on concerns of "piecemeal litigation," the "important interests of comity and finality implicated in federal habeas review of state convictions and sentences," and "the disruptive effect federal habeas review has on a state's criminal justice system" until all federal habeas claims are resolved. Clisby, 960 F.2d at 935. Such policy considerations "clearly favor the contemporaneous consideration of allegations of

47

constitutional violations grounded in the same factual basis," id. at 936, and that is true regardless of whether an evidentiary hearing in district court may be required on some, but not all, claims.

Thus, the district court erred in refusing to address the merits of all of Puiatti's claims. Nevertheless, in the interest of avoiding further delay in a case that has already lingered far too long (Puiatti filed his federal habeas petition over eighteen years ago), we elect to address the State's appeal on the penalty-phase severance claim rather than vacate the district court's judgment without prejudice and remand for full resolution.[14]

## IV. PENALTY-PHASE SEVERANCE CLAIM

Puiatti does not contend that joint penalty phases in capital cases are prohibited or are always per se unconstitutional. Rather, Puiatti argues that, under the particular circumstances of his capital case, the state trial court's denial of his

---

[14]The State argues that the district court abused its discretion in determining that an evidentiary hearing was warranted on Puiatti's remaining penalty-phase claims. We agree with Puiatti that the district court never actually decided this issue. Rather, at most the district court merely assumed that an evidentiary hearing may be needed if it were to reach Puiatti's remaining penalty-phase claims. In fact, the district court expressly stated that if this Court were to reverse the district court's grant of habeas relief as to Puiatti's penalty-phase severance claim, the district court on remand "would have to resolve Puiatti's claim that he is entitled to an evidentiary hearing."

We also decline the State's invitation to pass upon the propriety of an evidentiary hearing in the first instance. Of course, we point out that Puiatti, having successfully argued that the district court has not yet decided his entitlement to an evidentiary hearing, may not take a contrary position on remand.

severance motion violated his Eighth and Fourteenth Amendment right to an individualized sentencing determination.[15]  Although Puiatti's argument intertwines severance and individualized sentencing, we explain why these are separate and different concepts.  We start with established federal principles about joinder and severance, next review Puiatti's constitutional right to an individualized sentencing determination, and then analyze Puiatti's claims about his joint penalty trial.  Joinder and severance first.[16]

## A.    Joinder and Severance

"Joint trials play a vital role in the criminal justice system."  Zafiro v. United States, 506 U.S. 534, 537, 113 S. Ct. 933, 937 (1993) (quotation marks omitted); Richardson v. Marsh, 481 U.S. 200, 209, 107 S. Ct. 1702, 1708 (1987).  The general rule or preference is that defendants indicted together should be tried

---

[15]The State argues that Puiatti failed to exhaust this claim in state court and thus is procedurally barred from raising it in federal court.  Puiatti claims he adequately raised this claim on direct appeal and the Florida Supreme Court denied it.  We assume for purposes of this opinion only that Puiatti exhausted this claim because it lacks merit in any event.

[16]In this § 2254 proceeding, we examine only federal law and not whether Puiatti was entitled to severance under state law.  The Florida Supreme Court already held a severance was not required in the penalty phase of Puiatti's trial under Florida law.  Puiatti I, 495 So. 2d at 131. Further, in § 2254 cases, petitioners may raise only federal rights.  See McCullough v. Singletary, 967 F.2d 530, 535 (11th Cir. 1992) (noting that "[a] federal habeas petition may be entertained only on the ground that a petitioner is in custody in violation of the Constitution or laws or treaties of the United States," and thus "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved").  We discuss joinder and severance principles only because Puiatti makes what he calls a "severance constitutional claim," namely that denial of his severance motion deprived him of his constitutional right to an individualized sentencing determination.

together.  Zafiro, 506 U.S. at 537-38, 113 S. Ct. at 937; United States v. Baker, 432 F.3d 1189, 1236 (11th Cir. 2005).  "Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability – advantages which sometimes operate to the defendant's benefit."  Richardson, 481 U.S. at 210, 107 S. Ct. at 1708-09.  The Supreme Court has admonished that "[i]t would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand."  Id.  Joint trials have long been a common and preferred procedure in both federal and state courts.

Although these Supreme Court cases involve the guilt or innocence issue, the same considerations – serving justice, avoiding inconsistent verdicts, enabling more accurate assessments of relative culpability, fairness, and efficiency – that militate in favor of joinder of co-defendants' trials in the guilt phase also favor joint penalty trials.  See United States v. Tipton, 90 F.3d 861, 892 (4th Cir. 1996).  Accordingly, co-defendants charged with capital murder have been jointly tried not only in Florida but also under federal statutes for both the guilt and penalty phases.

50

See United States v. Bernard, 299 F.3d 467, 475 (5th Cir. 2002); United States v. Causey, 185 F.3d 407 (5th Cir. 1999); Tipton, 90 F.3d 861.[17]

Nonetheless, trial courts have discretion to grant a severance if a defendant carries his burden to show both that (1) a joint trial would actually prejudice the defendant and (2) a severance is the proper remedy for the prejudice, rather than jury instructions or another remedy. Zafiro, 506 U.S. at 539-41, 113 S. Ct. at 938-39; United States v. Browne, 505 F.3d 1229, 1268-69 (11th Cir. 2007); see also United States v. Blankenship, 382 F.3d 1110, 1122 (11th Cir. 2004) (noting that in Zafiro, "the Supreme Court set down a two-step test for determining whether a defendant is entitled to a new trial due to a district court's refusal to sever").[18]

As to the first Zafiro step, a defendant "must carry the heavy burden of demonstrating the lack of a fair trial due to actual, compelling prejudice." United States v. Chavez, 584 F.3d 1354, 1360 (11th Cir. 2009), cert. denied, 79 U.S.L.W. 3245 (U.S. Oct. 18, 2010) (No. 10-6534); see United States v. Gari, 572 F.3d 1352, 1365 (11th Cir. 2009) ("We will not reverse the denial of a severance motion absent a clear abuse of discretion resulting in compelling prejudice against which

---

[17]In Florida, as in federal court, the same jury that hears the guilt phase hears the penalty phase. See Maxwell v. Wainwright, 490 So. 2d 927, 933 (Fla. 1986).

[18]Our discussion does not focus on the text of any state or federal rule about joinder or severance because the question here is only whether the state courts' denial of severance violated the federal Constitution.

the district court could offer no protection." (quoting United States v. Walser, 3 F.3d 380, 385 (11th Cir. 1993))), cert. denied, 130 S. Ct. 1562 (2010); United States v. Novaton, 271 F.3d 968, 989 (11th Cir. 2001) (stating a defendant must discharge the "'heavy burden' of demonstrating 'compelling prejudice' from the denial of a motion to sever" (quoting United States v. Pepe, 747 F.2d 632, 650-51 (11th Cir. 1984))). In Zafiro, the Supreme Court explained that "[m]utually antagonistic defenses are not prejudicial per se."[19] Zafiro, 506 U.S. at 538, 113 S. Ct. at 938; see Blankenship, 382 F.3d at 1122 (stating Zafiro "specifically rejected the notion that defendants who have contradictory defenses are inherently prejudiced"). And "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540, 113 S. Ct. at 938.

As to the second Zafiro step, severance is not automatically required even if prejudice is shown. Zafiro, 506 U.S. at 539-40, 113 S. Ct. at 938. A court's limiting instruction to the jury will often cure any prejudice resulting from a joint trial. Zafiro, 506 U.S. at 539, 113 S. Ct. at 938. Zafiro teaches that a district court should grant severance "only if there is a serious risk that a joint trial would

---

[19]In Zafiro, the Supreme Court surveyed circuit court decisions and observed that "the courts have reversed relatively few convictions for failure to grant a severance on grounds of mutually antagonistic or irreconcilable defenses." 506 U.S. at 538, 113 S. Ct. at 937.

compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. Under Zafiro, there are only two circumstances in which severance is mandatory: where there is a serious risk that a joint trial (1) "would compromise a specific trial right of one of the defendants," or (2) would "prevent the jury from making a reliable judgment about guilt or innocence." United States v. Thompson, 422 F.3d 1285, 1292 (11th Cir. 2005) (quoting Zafiro, 506 U.S. at 539, 113 S. Ct. at 938); Browne, 505 F.3d at 1269; Blankenship, 382 F.3d at 1122-23.[20] "Aside from the two categories of defendants specified by the Supreme Court, most other defendants prejudiced by a joint trial are entitled only to curative instructions." Blankenship, 382 F.3d at 1123 (discussing "the two-step test" in Zafiro).

The decision whether to grant a severance lies within the trial court's sound or substantial discretion. Zafiro, 506 U.S. at 538-39, 113 S. Ct. at 938; Chavez, 584 F.3d at 1360 ("We will not reverse the denial of a severance motion in the absence of a clear abuse of discretion."); United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005) ("We will not reverse the denial of a severance motion

---

[20]In Blankenship, this Court said the first scenario for "mandatory severance" described by the Supreme Court in Zafiro "exists only where a joint trial leads to the denial of a constitutional right." 382 F.3d at 1123. We also observed that "[r]egarding the second scenario mentioned by Zafiro, the Court did not clearly explain what it meant by a jury being prevented from 'making a reliable judgment.'" Id. We then discussed potential situations where the "reliable judgment" exception might apply. Id. at 1123-25.

absent a clear abuse of discretion resulting in compelling prejudice against which the district court could offer no protection." (quoting Walser, 3 F.3d at 385)). Appellate courts are generally reluctant to second-guess a trial court's decision on severance. United States v. Baker, 432 F.3d 1189, 1236 (11th Cir. 2005); Ramirez, 426 F.3d at 1352; United States v. Novaton, 271 F.3d at 989.

Before analyzing Puiatti's claims about his joint trial, we review the Supreme Court decisions establishing his constitutional right to an individualized sentencing determination because Puiatti tries to link severance with that right.

## B. Puiatti's Constitutional Right to an Individualized Sentencing Determination

We start with Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2954 (1978), where the Supreme Court vacated a death sentence because the Ohio statute narrowly limited the type of mitigating factors the sentencer could consider.[21] A Supreme

---

[21]The Lockett Court described the Ohio statute:
Once a verdict of aggravated murder with specifications had been returned, the Ohio death penalty statute required the trial judge to impose a death sentence unless, after "considering the nature and circumstances of the offense" and Lockett's "history, character, and condition," he found by a preponderance of the evidence that (1) the victim had induced or facilitated the offense, (2) it was unlikely that Lockett would have committed the offense but for the fact that she "was under duress, coercion, or strong provocation," or (3) the offense was "primarily the product of [Lockett's] psychosis or mental deficiency."
Lockett, 438 U.S. at 593-94, 98 S. Ct. at 2959. Lockett argued her death sentence was invalid because the statute did not permit the sentencing judge to consider, as mitigation, evidence of Lockett's "character, prior record, age, lack of specific intent to cause death, and her relatively minor part in the crime." Id. at 597, 98 S. Ct. at 2961.

Court plurality discussed "the concept of individualized sentencing," stressing "[t]he need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual." Id. at 602, 605, 98 S. Ct. at 2963, 2965. The Supreme Court plurality noted the "historical repudiation" of mandatory death sentences for certain crimes, and how "the imposition of death by public authority is so profoundly different from all other penalties." Id. at 604-05, 98 S. Ct. at 2964-65. The Supreme Court plurality concluded that in capital cases, "the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Id. at 604, 98 S. Ct. at 2964 (quoting Woodson v. North Carolina, 428 U.S. 280, 304, 96 S. Ct. 2978, 2991 (1976) (plurality opinion)) (emphasis added). The Supreme Court plurality "conclude[d] that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Id. at 604, 98 S. Ct. at 2964-65 (emphasis omitted). "To meet constitutional requirements, a death penalty statute must not preclude

55

consideration of relevant mitigating factors." Id. at 608, 98 S. Ct. at 2967. The

Supreme Court held the Ohio statute invalid because it permitted consideration of

only three mitigating factors.[22] Id.

A few years later, a Supreme Court majority followed Lockett in Eddings v.

Oklahoma, where a capital defendant presented mitigating evidence about his

troubled childhood and emotional disorders, but the Oklahoma courts ruled that the

sentencer could not consider that mitigating evidence. 455 U.S. 104, 105-10, 102

S. Ct. 869, 872-74 (1982).[23] The Oklahoma statute provided that "evidence may be

presented [in sentencing] as to any mitigating circumstances or as to any of the

aggravating circumstances enumerated in this act." Id. at 106, 102 S. Ct. at 872.

The sentencing judge, however, stated he could not "consider the fact of this young

man's violent background." Id. at 109, 102 S. Ct. at 873. The Oklahoma appellate

court affirmed, effectively excluding family history as a factor excusing or

mitigating the capital defendant's behavior. See id. at 109-10, 102 S. Ct. at 874

(citing Eddings v. State, 616 P.2d 1159, 1170 (Okla. Crim. App. 1980)).

The Supreme Court in Eddings found "that the limitations placed by these

_____

[22]Lockett participated in the murder with three other persons, was tried separately, and thus had no severance issue. See Lockett, 438 U.S. at 591, 98 S. Ct. at 2958.

[23]Eddings pled nolo contendere to the murder charge and had only a penalty phase hearing. Eddings, 455 U.S. at 106, 102 S. Ct. at 872. Eddings had no co-defendants and thus no severance issue.

56

[Oklahoma] courts upon the mitigating evidence they would consider violated the rule in Lockett." Id. at 113, 102 S. Ct. at 876. The Eddings Court described Lockett as "the product of considerable history reflecting the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual." Id. at 110, 102 S. Ct. at 874 (emphasis added). The Eddings Court reasoned that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." Id. at 113-14, 102 S. Ct. at 876-77. Further, the sentencer "may determine the weight to be given relevant mitigating evidence," but "may not give it no weight by excluding such evidence from their consideration." Id. at 114-15, 102 S. Ct. at 877.

Next came the capital sentencing case of Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934 (1989), overruled on other grounds by Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002), where the Supreme Court vacated Penry's death sentence, stating, "To provide the individualized sentencing determination required by the Eighth Amendment, . . . the sentencer must be allowed to consider mitigating evidence." 492 U.S. at 316, 109 S. Ct. at 2945. Texas's statute directed that the jury would decide Penry's sentence by answering three questions, called

57

"special issues."[24] The Supreme Court previously had upheld that statute,

concluding that "the special issues would be interpreted broadly enough to permit

the sentencer to consider all of the relevant mitigating evidence a defendant might

present in imposing sentence." Id. at 315, 109 S. Ct. at 2945. Although Penry

presented mitigating evidence of mental retardation, organic brain damage, and a

childhood of deprivation and physical abuse, the jury was given only the three

questions and was never instructed that it could consider and give effect to Penry's

mitigating evidence in imposing sentence.[25] Id. at 320, 322, 109 S. Ct. at 2947-48.

The Penry Court stressed that "[u]nderlying Lockett and Eddings is the principle

that punishment should be directly related to the personal culpability of the

criminal defendant." Id. at 319, 109 S. Ct. at 2947. In Lockett, Eddings, and

Penry, "the constitutional defect lay in the fact that relevant mitigating evidence

---

[24]Penry would receive life imprisonment unless the jury unanimously answered "yes" to all three: (1) whether Penry's conduct "was committed deliberately and with the reasonable expectation that the death of the deceased or another would result"; (2) whether it was probable that Penry "would commit criminal acts of violence that would constitute a continuing threat to society"; and (3) whether Penry's conduct "was unreasonable in response to the provocation, if any, by the deceased." Penry, 492 U.S. at 310, 109 S. Ct. at 2942. The jury answered yes to all three special issues. Id. at 311, 109 S. Ct. at 2943.

[25]The Texas trial court denied Penry's motion to instruct the jury that: (1) it was authorized to issue "a discretionary grant of mercy based upon the existence of mitigating circumstances"; (2) it "may take into consideration all of the evidence whether aggravating or mitigating in nature which was submitted in the full trial of the case"; and (3) the State had to "show beyond a reasonable doubt that any aggravating circumstances found to exist outweigh any mitigating circumstances" before the death penalty could be imposed. Id. at 310-11, 109 S. Ct. at 2942.

was placed beyond the effective reach of the sentencer." Johnson v. Texas, 509 U.S. 350, 366, 113 S. Ct. 2658, 2668 (1993) (quoting Graham v. Collins, 506 U.S. 461, 475, 113 S. Ct. 892, 902 (1993)).

Recently, the Supreme Court again examined a Texas death penalty statute in Abdul-Kabir v. Quarterman, 550 U.S. 233, 127 S. Ct. 1654 (2007).[26]  The trial court instructed the jury to decide only two special issues: (1) whether the defendant's conduct that caused the victim's death was "committed deliberately and with the reasonable expectation that the death of the deceased or another would result"; and (2) whether there was "a probability that the defendant . . . would commit criminal acts of violence that would constitute a continuing threat to society." Id. at 238, 127 S. Ct. at 1660.  The Texas statute mandated a death sentence if the jury answered yes to both special issues.[27] Id. at 239, 127 S. Ct. at 1660.

Abdul-Kabir presented mitigating evidence from his mother, aunt, and

---

[26]The Texas statute then in effect "instruct[ed] the jury to decide '[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.'" Abdul-Kabir, 550 U.S. at 238 n.2, 127 S. Ct. at 1660 n.2 (quoting Tex. Code Crim. Proc. Ann., Art. 37.071, § 2(e)(1) (Vernon 2006)) (second alteration in original).

[27]Although Abdul-Kabir committed the capital murder with two other persons, the opinion does not mention whether he was tried together with the others or if Abdul-Kabir was tried alone.  There was no severance issue raised in Abdul-Kabir.

mental health experts.  Id. at 239-40, 127 S. Ct. at 1660-61.  The trial court refused

Abdul-Kabir's requested jury instructions that would have authorized a negative

answer to either of the special issues based on mitigation evidence.  Id. at 242, 127

S. Ct. at 1662.  The jury answered "yes" to both special issues, and Abdul-Kabir

was sentenced to death.  Id.

The Supreme Court observed that the sentencing process is "fatally flawed"

when "the jury is not permitted to give meaningful effect or a 'reasoned moral

response' to a defendant's mitigating evidence – because it is forbidden from doing

so by statute or a judicial interpretation of a statute."  Id. at 264, 127 S. Ct. at 1675.

Abdul-Kabir's mitigating evidence had relevance to his moral culpability beyond

the scope of the two special questions in the Texas statute, and the denial of his

requested instructions "provided the jury with no vehicle for expressing its

'reasoned moral response' to that evidence."  Id. at 252-53, 256-57, 127 S. Ct. at

1668, 1670 (quoting Franklin v. Lynaugh, 487 U.S. 164, 185, 108 S. Ct. 2320,

2333 (1988) (O'Connor, J., concurring)).  "[S]entencing juries must be able to give

meaningful consideration and effect to all mitigating evidence that might provide a

basis for refusing to impose the death penalty on a particular individual."  Id. at

246, 127 S. Ct. at 1664.

In summary, Lockett and its progeny establish that Puiatti has a

60

constitutional right under the Eighth and Fourteenth Amendments not only (1) to present any relevant mitigating evidence as to his unique, individual background, character, and record and the circumstances of his crime, but also (2) to have the sentencing jury or judge give meaningful consideration and effect to his mitigation evidence without such restrictions by state statute, judicial interpretation, or jury instructions.[28] Abdul-Kabir, 550 U.S. at 264-65, 127 S. Ct. at 1675; Eddings, 455 U.S. at 112-15, 102 S. Ct. at 875-77; Lockett, 438 U.S. at 604-05, 98 S. Ct. at 2964-65.

The core substantive ingredient in the constitutional right to an "individualized sentencing" is mitigation evidence relevant to the capital defendant as an individual or unique person (whether his background, character, mental health record, or circumstances of his crime), which a jury may consider to assess personal moral culpability and to determine an individualized sentence. None of these Supreme Court cases mentions joinder or severance. The constitutional right involved is not based on, or tied to, a separate trial. Rather, the constitutional right stems from the need for a presentation of, and consideration of, mitigation

---

[28]The lesson of Lockett and its progeny is that "[t]he Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight." Schwab v. Crosby, 451 F.3d 1308, 1329 (11th Cir. 2006).

evidence relevant to the defendant as a unique individual.  With this background, we turn to Puiatti's claims about his joint trial.

## C.     Puiatti's Claims on Appeal

As noted earlier, Puiatti claims that the trial court's denial of his severance motion (and resulting joint trial) violated his constitutional right to an individualized sentencing determination.  For numerous reasons, Puiatti's claim wholly fails.

First, Puiatti was not prevented from presenting any mitigating evidence. Puiatti has not proffered a single piece of evidence he was unable to put before the jury or judge for consideration by virtue of the joint penalty phase.

Second, no state statute nor judicial interpretation nor jury instruction restricted the jury or judge from considering, or acting upon, Puiatti's mitigation evidence.  Rather, the Florida trial court appropriately instructed the jury during the penalty phase to carefully weigh and consider "all of" the evidence presented, stating, "Before you ballot you should carefully weigh, sift and consider the evidence, and all of it, realizing that human life is at stake, and you should bring to bear your best judgment in reaching your advisory sentence."

The state trial court also instructed the jury about the potential sentences for

Glock and Puiatti separately and individually.[29]  "Jurors routinely serve as impartial factfinders in cases that involve sensitive, even life-and-death matters" and "[i]n those cases, as in all cases, juries are presumed to follow the court's instructions."  Hammond v. Hall, 586 F.3d 1289, 1334 (11th Cir. 2009) (quoting CSX Transp., Inc. v. Hensley, — U.S. —, 129 S. Ct. 2139, 2141 (2009)).  Courts presume that the jury heard, understood, and followed the court's instructions.  Richardson, 481 U.S. at 208-11, 107 S. Ct. at 1708-09.

Third, although Puiatti attempts to connect and intertwine severance with his constitutional right to an individualized sentencing determination, we can locate, and Puiatti has cited, no Supreme Court decision doing so.  Lockett and its progeny do not address joint penalty phases or say that the presence of a co-defendant at a

---

[29]The state trial court instructed the jury, in pertinent part:

Now, if a majority of the jury determine[s] that Robert Glock, II, should be sentenced to death, your advisory sentence will be a majority of the jury, by a vote of – and a number, whatever number voted so voted advise and recommend to the Court that it impose the death penalty upon Robert D. Glock, II.

If a majority of the jury determine[s] that Carl Puiatti should be sentenced to death, your advisory sentence will be a majority of the jury, by a vote of – and indicate whatever that vote is, advise and recommend to the Court that it impose the death penalty upon Carl Puiatti.

On the other hand, if by six or more votes, the jury determines that Robert D. Glock, II, should not be sentenced to death, your advisory sentence will be the jury advises and recommends to the Court that it impose a sentence of life imprisonment upon Robert D. Glock, II, without possibility of parole for twenty-five years.

And if by six or more votes the jury determines that Carl Puiatti should not be sentenced to death, your advisory sentence will be the jury advises and recommends to the Court that it impose a sentence of life imprisonment upon Carl Puiatti without possibility of parole for twenty-five years.

63

capital defendant's penalty phase trial has any Eighth Amendment implications whatsoever. None of the <u>Lockett</u> line of cases relates to severance or helps Puiatti's claim at all. Puiatti, like the district court, cites no precedent that suggests a joint penalty trial is improper for co-defendants who were properly joined in the guilt phase. The Supreme Court has never intimated, much less held, that the special concerns in capital cases require, or even suggest, that severance is necessary.

Fourth, while we consider Puiatti's § 2254 appeal separately from Glock's, this Court already has rejected Glock's claim that a joint trial deprived him of an individualized sentencing determination. <u>See</u> <u>Glock V</u>, 84 F.3d at 385-86 (rejecting as non-meritorious Glock's claim "that his sentence should be set aside because . . . the trial court refused to sever his sentencing proceeding from his co-defendant's, thereby depriving him of individualized sentencing").

For all four reasons, Puiatti has not shown the state trial court's severance denial deprived Puiatti of his constitutional right to an individualized sentencing determination.

We could stop here but for the fact that Puiatti, as a pre-AEDPA petitioner, also tries to advance a new constitutional theory.[30] Even though a separate penalty

---

[30]Under AEDPA, a petitioner must show the state court's decision denying his claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as

64

trial is not part of his constitutional right to an individualized sentencing determination, Puiatti argues that the severance denial and joint penalty phase, under the facts of his case, prejudiced him to the point of effectively denying his constitutional right to an individualized sentencing decision or at least a fair hearing. A threshold problem for Puiatti is that he has not shown any severance error at all, much less severance error rising to the level of a constitutional violation.

For example, Puiatti has not satisfied the prejudice requirement at Zafiro's first step for analyzing severance claims. Puiatti claims he was prejudiced because his mitigation theory – substantial domination by Glock – was undermined by Glock's mitigation defense that Glock was a follower, too. However, Glock's expert Dr. Mussenden, although testifying Glock was a follower, also testified that Glock's role in Ritchie's murder was an "expression of [Glock]'s anger and resentment towards women and all of the failure and rejection he had experienced all his life."[31] In closing, Glock's counsel never argued that Glock was under the substantial domination of Puiatti at the time of the crime and expressly disclaimed

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The phrase "clearly established Federal law" refers "to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1178 (11th Cir. 2010) (brackets omitted). Here, however, Puiatti filed his § 2254 petition before the enactment of AEDPA.

[31]Dr. Mussenden had not examined Puiatti.

65

any argument to that effect.

If anything, Glock and Puiatti presented similar mitigation theories – counsel for Puiatti and Glock both argued their clients were insecure, easily led men who were under stress because of personality problems, unfortunate circumstances, and poor relationships with their families, but who nevertheless would not have committed the murder but for the presence and association of the other. Simply put, the defendants did not present antagonistic mitigation defenses.

In any event, the Supreme Court has held expressly that "[m]utually antagonistic defenses are not prejudicial per se." Zafiro, 506 U.S. at 538, 113 S. Ct. at 938. "The Supreme Court has held that co-defendants do not suffer prejudice simply because one co-defendant's defense directly inculpates another, or it is logically impossible for a jury to believe both co-defendants' defenses." Blankenship, 382 F.3d at 1125 (discussing Zafiro). This also underscores the vital role of a joint trial in preventing inconsistent verdicts.

Puiatti also complains that Glock's counsel (as well as the State) got to cross-examine Puiatti's mental health experts, Drs. DelBeato and Meadows. This also did not prejudice Puiatti. Glock's counsel's questioning of DelBeato and Meadows was brief, with only a few questions each. Glock's counsel had DelBeato and Meadows admit that neither expert had examined Glock and that

66

whether Puiatti was influenced by Glock depended on Glock's psyche as well as

Puiatti's.[32] Glock's counsel's cross-examination did not cause the introduction of

irrelevant or incompetent evidence. "[A] fair trial does not include the right to

exclude relevant and competent evidence." Zafiro, 506 U.S. at 540, 113 S. Ct. at

938.

Puiatti also argues that the fact that Glock testified, and Puiatti did not,

prejudiced him. Puiatti points to no case in which the Supreme Court or this Court

has held that a non-testifying defendant is prejudiced by the mere fact that one of

---

[32]Glock's counsel's entire cross-examination of Dr. DelBeato was:
Q.     Dr. DelBeato, is it true that most people are more easily influenced when they're under stress?
A.     Yes.
Q.     And is it fair to say that whether or not somebody is being influenced or manipulated by another, that [not] only depends on the person, the psychological profile of the person that's being influenced, but also the possibility of a person who's in the position to influence the psychological profile?
A.     There would be a relationship.
Q.     And you have never examined this man?
A.     No.
Glock's counsel's cross-examination of Dr. Meadows was similarly brief:
Q.     Dr. Meadows, whether – is it fair to say that whether or not Mr. Puiatti was under substantial domination of another person at the time of the offense would depend on the psychological profile of the other person?
A.     Without understanding, you know, in detail, I would say it is possible, yes.
Q.     Have you ever done any tests or reviewed any records of Robert Glock, II?
A.     The confession, um, I have had some sketchy data about his background and temperament from the defendant, from Mr. Puiatti's counselor.
Q.     Okay. But you have not seen any psychological testing, reports of Mr. Glock, is that correct?
A.     That's correct.

67

his co-defendants chooses to testify. In fact, we have concluded that "favorable observation of the willingness of one of several co-defendants to testify does not constitute an impermissible comment on the failure of the other co-defendants to testify." United States v. O'Neill, 767 F.2d 780, 786 (11th Cir. 1985) (quoting United States v. Vera, 701 F.2d 1349, 1363 (11th Cir. 1983)). Moreover, Puiatti's argument ignores that Glock testified briefly and only about the remorse he felt for Ritchie's murder. Puiatti used multiple penalty-phase witnesses to testify that he too was remorseful. Puiatti was able to, and did, impart similar testimony to the jury without testifying.[33] If anything, the fact that Glock testified helped Puiatti because Glock did not deny the joint confession's statements that Glock suggested the idea of killing Ritchie and Glock fired the last two shots that killed her.

Puiatti also argues the fact that Glock argued the mitigating factor of no significant prior criminal history applied to him highlighted Puiatti's lack of ability to argue this factor for himself. However, Puiatti's own penalty-phase witnesses testified that Puiatti was involved in a burglary and was on probation at the time of Ritchie's murder. Even in a separate penalty trial, the jury would know Puiatti

---

[33]We reject Puiatti's argument that he was prejudiced by the fact that Glock's penalty-phase witnesses testified after Puiatti's expert Dr. DelBeato but before Puiatti's other witnesses, thereby splitting Puiatti's case. Not only does this argument rest on a canard that jurors are unable to account for an out-of-order witness, but Puiatti's own counsel requested that Dr. DelBeato testify first in order to accommodate Dr. DelBeato's schedule.

already had a criminal history.[34]  There was no vast disparity in either the quality or quantity of mitigation evidence presented by Puiatti and Glock.

The bottom line is Puiatti's prejudice claim essentially rests upon an implicit contention that a separate penalty trial is required whenever a co-defendant's presence might reduce a defendant's chance to avoid a death sentence.  We have found nothing in severance law or Eighth Amendment jurisprudence to support this position.  See Zafiro, 506 U.S. at 540, 113 S. Ct. at 938 (stating that "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials").  Puiatti has failed to show any specific way that he was prejudiced by being tried jointly with Glock at the penalty phase.

Indeed, the specific facts of this case made a joint penalty phase particularly appropriate.  Puiatti and Glock acted together in planning and effecting the abduction, robbery, and murder of Ritchie.  Both Puiatti and Glock fired shots at Ritchie.  It was Puiatti who was the first to fire shots at and strike the helpless victim from close range.  Puiatti and Glock issued a joint interlocking confession that agreed on how many shots were fired, who fired each of them, and when.

---

[34]And even in a separate penalty phase, the State would have been entitled to point to Glock's lack of prior criminal history to rebut a potential argument by Puiatti that Puiatti was an easily influenced man who was following Glock's lead in murdering Ritchie.

Puiatti and Glock kept driving by and shooting Ritchie until they were sure she would die. As the state trial court aptly noted, this case is a "classic example of why joint defendants ought to be [tried] together in order to get justice."

In fact, Puiatti's joint trial with Glock avoided the inequity of inconsistent verdicts and one capital defendant going second with the benefits of previewing the State's evidence and arguments. See Richardson, 481 U.S. at 210, 107 S. Ct. at 1708-09 (stating, "Joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts" and by not "randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand"). The Lockett-Eddings-Penry-Abdul-Kabir principle that the sentencer must be allowed to consider and give effect to "all relevant mitigating evidence," see Eddings, 455 U.S. at 117, 102 S. Ct. at 878, is quite compatible with a joint trial. To the extent any arguable tension may exist between joint trials and individualized sentencing, it did not occur here. See Bernard, 299 F.3d at 475 (noting potential tension between joinder and a defendant's right to an individualized capital sentencing decision, but affirming defendant's death sentence in a joint trial).

If any two capital co-defendants could be properly joined in a penalty phase, it was Puiatti and Glock. Puiatti has not shown that his severance denial violated

70

any constitutional right.

## V.  CONCLUSION

Accordingly, we reverse the district court's judgment vacating Puiatti's death sentence.  On remand, the district court shall consider and resolve all of Puiatti's other constitutional claims as to his death sentence.

**REVERSED AND REMANDED.**